Good morning. May it please the Court, my name is William Burke, and I represent the appellant, AmeriCredit Financial Services, in this appeal. I'd like to reserve about three minutes for rebuttal, please. I am really privileged to present this argument to the Court because this case is of enormous importance to the automobile sales and financing industries and to the public which they serve. The precise issue presented to this honorable Court this morning has been the subject of seven Federal Circuit Court opinions in six different circuits. And every one of those opinions supports the position taken by AmeriCredit in this appeal. Not one Federal Circuit Court has ruled to the contrary. But there have been some dissents. There have been some dissents, yes, Your Honor. In fact, many of the negative equity cases that were relied upon by the lower court in its opinion in this case have now been directly reversed on appeal or overruled, several of them. So the overwhelming weight of authority supports the position taken by AmeriCredit in this case, and that includes authority at every level of appeal, both trial and appellate cases. I think the count right now on appeal is 14 to 2. Most of the cases and all of the circuit court opinions that have addressed this issue look to State law for the answer. And that State law is Article 9 of the Uniform Commercial Code and State Retail Installment Sales Acts. Section 9103 of California's Article 9 defines the term that is the crux of this appeal, purchase money security interest. I've got a basic problem, and this is kind of an ignorant approach. But it just seems to me a purchase money mortgage should be for the amount of the purchase and the value of the article purchased or less. Here, the value of the article purchased, I think, is uncontested, that the cash price of the Ford Taurus was $25,600, and the amount of the mortgage was $31,700. So we have a mortgage against this vehicle that exceeds the value of the vehicle by $6,100, and yet you want to call it a purchase money mortgage, even though we're financing much more than the cost of the purchase. That's my basic problem. Thank you, Your Honor. And that's addressed very specifically in Comment 3 of Section 9103. And Comment 3 explicates the meaning of the terms price and value in Section 9103. Well, it has a lot of words.  It has a lot of words, but those words directly relate to the question you just asked, Your Honor. Because Comment 3 doesn't just limit items to be price or value that are the value of the vehicle, the purchase price, the sort of things you mentioned. Comment 3 is very broad and expansive, and it defines price and value to include expenses incurred in connection with acquiring rights in the collateral. It includes sales taxes, duties, finance charges, freight charges, administrative fees, taxes, freight charges, cost of storage, demurrage, expenses of collection, attorneys' fees, costs that the secured creditor incurs after the transaction has been incurred to preserve the collateral if the debtor breaches that obligation. So the definition of price and value in Comment 3 of Section 9103 is very broad and expansive. All it requires is a close message. But you're asking us to add to that list negative equity. Yes. Which is quite different from the things that are now on the list. But remember, the courts have uniformly held, Your Honor, that the ejusdem generis doctrine, the Latin doctrine, that requires the items to be similar to each other, does not apply to Comment 3, because Comment 3 begins the list. I'm sorry. At the end, it says the word similar. That's right. And that's my very point, because Comment 3 begins the list with obligations for expenses incurred in connection with acquiring rights in the collateral. And then it lists the litany of expenses that I just read, and it includes other similar obligations. Other similar obligations expresses the notion that Your Honor just raised, that they have to be similar. But the first item of the list is quite distinct from that. It doesn't require that they be similar. And requiring the first item of the list to be similar to the others would violate the rule of statutory construction. Every word in the statute has to be given effect to. But then you put a lot of weight, then, on the phrase in connection with. I understand the argument. And I don't see how it can possibly be said that the charge for negative equity is not a charge or an obligation in connection with acquiring rights in the vehicle. Mrs. Penrod. There's an old philosophical saw of a philosophy professor at the beginning of a class throwing chalk against the blackboard. The blackboard breaks, and he says, I've just affected the coastline of China, making the point that everything is connected with everything else. Okay. So I understand it's connected. Is it connected within the meaning of this comment? That's a different question. We submit that it absolutely is. And the reason is that Mrs. Penrod, when she went into that dealership to purchase her new vehicle, she wanted the dealer to accept her used car as a trade-in. That was her choice. In order for the dealer to accept the used car as a trade-in, the debt on that car, including the negative equity, had to be discharged. It's got to be remembered that the purchase of the new car by Mrs. Penrod and her trade-in of her used car was an integrated, single, reciprocal, mutually dependent transaction. There is a very close connection. She wouldn't have purchased the new car unless the dealer accepted her used car and paid the debt on it. The dealer is not going to accept her used car and pay the debt on it unless she buys the new car. I don't know how you can get a closer connection. One of the appellate courts, I believe it's Muldrew, said a closer nexus can hardly be imagined. So this isn't like an attenuated expense that has no relationship to the transaction. That transaction would have stopped dead if the negative equity was not paid on that trade-in vehicle. And that's what the courts have been relying on and holding. This is a package transaction that was negotiated between Penrod and the dealer in which a package of closely related transaction costs that fit neatly within the comment three definition was paid for by the dealer, was financed by the dealer. And that's why it meets the close nexus test. If you postulate for a moment, I just would like the Court to consider this example. Supposing ---- with that phrase, obligation for expenses incurred, I mean, incurred in connection with. Expenses is also a troublesome word here. That sounds like expense with, okay, expense for fixing up the vehicle, polishing the vehicle, doing various other things. I have trouble seeing how negative equity is an expense in that sense. I just don't get it. Then I think, Your Honor, you'd have the same trouble with seeing how attorneys' fees, collection costs. Oh, I can see that quite easily. Storage fees. And those sort of things are expenses incurred in connection with the value of the vehicle or acquiring the vehicle. This is very much the same sort of expense. There's no reason to me it seems to not treat this as an expense incurred in connection with the transaction. And that's why the appellate courts have uniformly reached this result. Now, if you think of it this way, supposing Mrs. Penrod had gone into the dealership with a trade-in that had a positive equity of $7,000, traded in her used car, got a credit against the purchase price of the new car for that positive equity of $7,000, would anybody dispute the fact that that's a single integrated reciprocal transaction and not two separate unrelated transactions that have no close nexus to each other? Would Penrod now be coming into this Court and arguing that, yes, that's a single indebtedness out of a single contract secured by a single vehicle, but we want to split it up into two transactions, which would thereby increase AmeriCredit's secured claim in her bankruptcy? I mean, as you can tell, I'm having trouble with your position, and I want to put out all my difficulties so that you get a chance to respond. Part of my trouble goes to the function of the hanging paragraph. The hanging paragraph clearly is designed to protect financiers of automobile transactions such that you get a security interest protected up to the value of the indebtedness, even above the value of the collateral. I understand that. And you're already getting more favorable treatment in bankruptcy than most secured creditors who are protected only up to the value of the collateral. But you're asking for more than the actual purchase price of the vehicle. As most ordinary people would understand purchase price, you want it for whatever amount of indebtedness has been put against that as part of that original transaction. Even here, $7,000 and change more than the price of the vehicle. So you're asking not only for favorable treatment beyond the value of the collateral, you're asking for more favorable treatment beyond even the price of the car. But, Your Honor, it's presuming that the hanging paragraph, the term purchase money security interest, is by definition limited to the value of the collateral. And it's not. Well, I mean, that's the argument. Well, I don't think how can you reach any other result when you read comment 3. The list of expenses in comment 3 are not expenses that are solely related to the value of the vehicle. Many of them occur after the transaction has been completed, the vehicle has been driven off the lot. So we're not asking for anything more under the hanging paragraph than is encompassed within the plain meaning of the term purchase money security interest. And that plain meaning encompasses lots of costs and expenses that are far beyond the value of the vehicle. This may be an unfair question, and it's a question to which I do not know the answer. We've got a lot of circuits that have gone your way, as you quite accurately state. Do you know how many of those cases in those circuits came through a BAP? I know many circuits don't even have a BAP. And do you know if any or several or whatever number might have come through a BAP? I don't think any of them came through a BAP. I'm sorry. In re Gropner might have proceeded through the BAP in the 11th Circuit. Peasley didn't, which is 2nd Circuit. 4th Circuit, In re Price didn't go through the BAP. The 5th Circuit, the Dale case, which was my case, didn't go through the BAP. The 8th and the 10th Circuit might have gone through a BAP. I'd have to check that. One or two of them might have, but most of them didn't. But I don't think that should change the result. I want to point out one other. It does for me in a slight way. I'm not an expert in bankruptcy. By and large, it's an open secret that Article III judges are not experts in bankruptcy. And one of the reasons we have a BAP is that it helps us sort out various questions. We have here an opinion by probably one of the foremost experts in bankruptcy law, Bruce Markell, in this case, coming up from the BAP. So to me it does make a little bit of difference. Not necessarily that there was no BAP in those others, but we've got genuine bankruptcy experts whose opinion you're appealing from. Right. But there's also, you have to remember that all of these cases start in the bankruptcy court. Of course. And if you add up, you toad up the cases in the bankruptcy courts that have ruled on this issue, whether they were affirmed or reversed on appeal, whatever happened to them in subsequent history, the overwhelming majority come to the conclusion that the circuit courts have reached. So this is not just a series of circuit judges sitting in six different circuits reaching this result on their own. They all come out of the bankruptcy courts, and there's been a very large number of respected bankruptcy judges, just as much as Judge Markell, who have reached the conclusion that the circuit courts have reached in this case. So this is not just circuit courts that have come to this conclusion. Fair response. I'd also like to just emphasize, because this goes to the close connection, you know, how is this related to a motor vehicle and some of the things that Your Honor raised, and that is the charge for negative equity is specifically authorized by the California Automobile Sales Finance Act as appropriate to a retail installment sale contract. In addition to that, the California Automobile Sales Finance Act, adopted by the California legislature, also dictates and requires the charge for negative equity be disclosed to consumers as part of the price of the motor vehicle. And we believe this is significant because the California legislature has determined that the charge for negative equity is closely connected, there's a close nexus to the purchase and installment sale of motor vehicles, and that's why it's permitted. And the close nexus test is a precise test that is used in Article 9. In addition to that, the California ASFA requires that the charge be disclosed as part of the price of the vehicle, and price is the term that is used in Article 9. So I think that's significant. And a lot of the charges and expenses that you hear about in some of the briefs that we see that are unrelated to automobile financing would not be permitted under the ASFA. But ASFA permits this charge and most of the other charges that are listed in Comment 3. And I think that reading these two statutes in peri materia leads to the same result. Okay. Now, you wanted to save a little time. I did. You're down to one minute and change. Oh, I better. Okay. One minute and change of my principal argument, or? Well, we'll make sure you get to say whatever you need to say. Thank you, Your Honor. Good morning. May it please the Court. Kenneth N. Klee for Applee Marlene Penrod. Mr. Klee, why are the other circuits wrong? I think that fair people can differ on how to come down on a difficult issue. And as Judge Fletcher said, the other circuits aren't bankruptcy experts. And if you simply look at this from the narrow perspective of automobile finance considerations, the other circuits are protecting the automobile finance process and industry, but they're not considering important bankruptcy policies and they're not considering the entirety of the hanging paragraph. And those are two fundamental points that I want to call to the attention of this panel. The hanging paragraph itself was originally lobbied in by the auto manufacturers because debtors were marking down the values of newly purchased cars shortly after they bought them. They filed for bankruptcy. And the value goes down as soon as the car goes off the lot. And this has nothing to do with negative equity. This is in automobile finance transactions where there was no trade-in and no negative equity. If you finance a car and you take it off the lot and you file bankruptcy, the value plunges. And so that was the impetus behind this. And the briefs have extensive legislative history about this. The auto finance industry tried to get it lobbied in, in whole or in part, to protect these things. The ultimate language is what it is. But the other creditors said, wait a minute, what about us? And so the ultimate hanging paragraph, Judge Mills, that was put into the law, says purchase money security interest, 910 days for an automobile, and one year for any other property of value. So the decision that this Court makes today isn't just going to affect Marlene Penrod and one negative equity in an auto finance. It's going to go to department store financing. It's going to go to other types of personal property financing. Some department stores have a policy that everything you buy at the department store on time, on an installment sale, doesn't get paid off. It all gets treated pro rata. So you go in 11 months before you file for bankruptcy and buy that new toaster or golf bag at the department store, it's a purchase money financing. And it's going to tie in all the other items of personality that you've had for years. And it's the very same paragraph, the hanging paragraph, that uses the word purchase money security interest that talks about this auto finance and talks about other items of collateral of value. So this panel's decision is of enormous significance to millions of debtors. Is it affected in any way by the drive-through policy of bankruptcy now? It is, Your Honor. The means test that was put in in the 2005 amendments were designed to put more debtors into Chapter 13 and to prevent debtors from getting an immediate fresh start in Chapter 7 if they had sufficient income with which to repay their creditors. But the demands of Chapter 13 are substantial. A creditor with an allowed secured claim has to be paid in full on a present value basis over a plan that cannot exceed five years. Now look at Marlene Penrod. She had her Ford Explorer in 1999, and come 2005 she still had a $13,000 balance on that debt. To amortize these debts over five years is tough enough on a vehicle purchased without negative equity. If you pile negative equity on top of that, you've got a very real prospect that for many of these debtors, they will not be able to confirm a Chapter 13 plan because they won't have sufficient income to pay the secured debt. It's not just a question, as appellant says, of taking money out of the unsecured creditor's pockets and putting it into the secured creditor's pockets. It's preventing the debtors from confirming the plans because they don't have enough income to pay that debt on a five-year basis. And if they are above the means test, they can't get a discharge in Chapter 7, which means that they're out on the street. Why is this financing done? Why do lenders take on negative equity? They do it because there's a business opportunity. The rate in this case, and this is all in the record, pages 125 to 128 in tab 14 of volume 2. We've got the contract, and I'm sure you've strained reading it as much as I did. It's all in the record, 20% financing. The goal here is to keep a debt running forever at 20% interest. That's where the profit is. And that's a much different consideration than financing a new vehicle purchase for which this law was designed. Now, if I might, there are other bankruptcy policies that are implicated by a reversal in this case, and I just want to get them on the table. First of all, I think we agree with the appellant that it is the price prong that this Court should be looking at. This is an installment sale contract. This is Hansel Ford selling a vehicle to Marlene Penrod. This is not a financial accommodation contract. This is not a contract to go ahead and induce somebody to acquire property. This is seller financing. As such, if you look historically at the Uniform Commercial Code, there are two alternative tests, mutually exclusive, exclusive or tests, one if you have seller financing and another if you have an enabling loan. The briefs have conflated these concepts, and most of the appellate courts that I think got this wrong looked at this close nexus test based on the enabling loan concept. That only applies if you have a third-party lender coming into the situation. We don't have that here. Hansel Ford made this transaction with Marlene Penrod. It then assigned its paper to AmeriCredit, but they stand in Hansel Ford's shoes. So if you look at the old 9107, it had two separate paragraphs. When this was redrafted in the revised Article 9, it was all put into 9103 with a big or in between. But I think looking at the history of this, that has to be an exclusive or, and that the only prong that we're to be looking at in this case is the price prong that should apply to a seller who finances an installment sale contract of this type. If the negative equity isn't a deal-breaker in the case, I can see some logical possibilities. But it is a deal-breaker. If it's not there, the purchaser is going to walk off the lot with their jalopy and shop it somewhere else, and the deal doesn't happen. Well, we don't know that, Your Honor. These courts have decided that this is such an integral part of the purchase that it has to be treated as a unitary. Your Honor, we don't know that. I mean, we know that. We know that the contract is unitary. We know that it's done that way. But when I've gone to buy a car, I'm sure when you go to buy a car, the first thing you do is you agree on the price of the car. And then the dealer says, oh, do you have a trade-in? And then there's a separate negotiation over the amount of the trade-in and whether there's positive or negative equity. The answer to the question of what is the price of the car and about all these expenses in 9103 and Comment 3 is you can buy a car without a trade-in. And you pay all these costs, tax, license, all these storage fees, all these fees they add on. All of that's within the scope of purchase money security interest. But you don't have to have a trade-in in order to buy a car. I don't know whether Marlene Penrod could have come up with a down payment to buy this car without the trade-in. I looked in the record. I couldn't find it. Maybe it's in there, but I couldn't find it, Your Honor. And it's not going to mean that debtors can't buy cars. The automobile finance industry financed cars before 2005. And they financed it with negative equity. And they made good money doing it. And they're going to continue to make good money doing it. They've been doing it since 2005 with the case law split nearly down the middle. If this Court affirms this case, automobile financing in the Ninth Circuit will not come to a screeching halt. It won't happen. And this notion that financiers always raise, unless you give us everything we want, we pass on interest rates, that's not going to happen either. The L in the room, I guess, is the dischargeability and the preference. Yes. Had this transaction been structured as an acquisition of the old indebtedness, there clearly would be no protection. Had this AmeriCredit or had the dealership said, by the way, we want to do this as a separate transaction, this would not be a protected transaction. It would be outside the 910-day period. And one of the things the briefs have missed, and I'm calling this to the Court's attention for whatever purposes it's worth, this process has been analogized to the enabling loan in Section 547C3 of the Bankruptcy Code. But 547A2 of the Bankruptcy Code contains a very important definition for new value. And an enabling loan can only involve new value. And I want to read for your benefit just the last line of the definition of new value in 547A2. But does not include an obligation substituted for an existing obligation. So new value does not include a new obligation substituted for an existing obligation. And that's exactly what we have here with respect to the negative equity and the loan on the 1999 Ford Explorer. We have a dealer that is voluntarily coming in and substituting itself for the old lender on that old car. And trying to wrap itself now in the protection of purchase money security interest that's designed for purchasers of vehicles whether or not they trade in old cars and whether or not the old cars have negative equity. Now, going to the topic of preference, there is this strong policy in bankruptcy of equality of distribution among creditors similarly situated. And undersecured and unsecured creditors are similarly situated. Of course, the appellant maintains, well, we're secured. We have a purchase money security interest. But to the extent the negative equity isn't backed by any collateral, this is a security interest that is underwater. It's secured by nothing. Right. It's a security interest in the Pickwickian sense. It's a security interest because they call it that. Exactly. Ipsy-Dixit, as Judge Goodwin said in a previous argument. Well, if we rule in favor of your position, wouldn't this encourage people to trade in their upside-down car for a new vehicle and then file for bankruptcy? Most of the time they do this, it's because they don't want to file for bankruptcy. If they're in a position where they're forced into 20% auto financing and they've got 80,000 miles on a six-year-old car, they're desperate to get a new vehicle and they trade in their old vehicle and they do that. The last thing in the world these people want to do is file for bankruptcy. If the law is otherwise what the incentive you'll create is, is file for bankruptcy first. Take your six-year-old Ford Explorer. It's not in the 910-day period. By the way, they wanted five years to begin with. It was compromised at two and a half years. That's how they got to 910 days, if you're interested. The six-year-old Ford Explorer outside the 910 days, that's dischargeable. We can take that $13,000 balance remaining, value it down to the $6,000 value of the car, cram it down in Chapter 13, file first, then go out and buy your new car after bankruptcy. That's the incentives you'll be creating. So this is obviously an issue on which reasonable minds can differ, but I think the better view here is to affirm. Judge Markell has written an excellent decision, and speaking of dissenting decisions from other circuits, I think Judge Advai's decision in the Eighth Circuit is a very well-reasoned opinion on this particular topic, and I commend it to your reading. I want to make one point about Dean v. Davis. The appellant in its reply brief says that Dean v. Davis supports it because it says that when you make an advance like this, it's contemporaneous, so there can be no preference. And I agree with that. But if you read Dean v. Davis, a 1917 Supreme Court case, you'll find that they avoided the transfer in question as an actual intent fraudulent transfer because the lender knew it was making a loan, the proceeds of which would be used to pay a preference. And that's exactly what we have here, albeit outside the 90-day preference period, but we have a loan that was intended to pay off an underwater upside-down previous vehicle. And so I think under the rationale of Dean v. Davis, there is a basis to say that this type of transaction should not be protected. I think that that is about all the time I have. If you have questions, I'm happy to answer them. I think not. Thank you. All right. Thank you. Mr. Burke. Thank you. I have numerous points I'd like to make in response, if the Court will permit me. First of all, Your Honor asked about, well, the normal meaning of the term price and value doesn't seem to include things other than the actual value of the vehicle. And I would just want to point out that oftentimes in Article 9 and the Uniform Commercial Code, terms are used that are given by comment, meanings that are not in comport with the normal understanding. And price and value is a good example of that. And if you look at Comment 3, it includes lots of items of expense that you would not normally think of as part of the price or value definition. Secondly, Your Honor asked about bankruptcy expertise and the fact that Judge Markell was a bankruptcy judge. In addition to the point I made earlier about the fact there's lots of other bankruptcy judges that have come to the same conclusion as the circuit courts, I want to point out if you read Judge Markell's opinion, 90 percent of that opinion is not bankruptcy. It's Article 9. And I think the circuit courts are just as competent to decide cases, including this court, under Article 9 as bankruptcy judges are to decide bankruptcy law. So this is really was treated by Judge Markell as an Article 9 issue and not a bankruptcy issue. Mr. Klee talks about department store financing and how terrible this is going to be in department store type financing. Is there no evidence that this is the case? That's certainly not the facts that are before the court this morning. Do you disagree not as to whether the consequence is horrible and so on, but do you disagree with his legal analysis? Yes. I don't think that there's anything in the hanging paragraph that is going to lead to the sorts of abuses. I didn't ask that. Okay. I asked about the legal analysis. The legal analysis being? He says that if a department store keeps an open line of credit such that I don't pay off the early purchased item until I've purchased, until I've paid off everything, that that then qualifies under the hanging paragraph. I absolutely disagree with that. That's the N. Ray Matthews case. Lots of those cases have been decided under Section 522 of the Bankruptcy Code. And those cases all involve serial purchases of household goods where the seller keeps the lien on all items until they've all been paid. That would not be permitted under the hanging paragraph, under any sentence or paragraph of the hanging paragraph. And that's not our case. We have a single contract. Yes. Okay. Secondly, Mr. Klee claims that this is going to result in plans not being confirmable. There's no evidence whatsoever in the record. It's not claimed in the briefs. And there's no empirical evidence to support the claim that this is going to result in debtors not being able to confirm their plans. Well, let me ask you this. I mean, the basis for his statement that it's going to result in lots of 13 plans not being confirmable is that it's going to increase the amount of secured debt that has to be paid out of the income of the debtor. Is that correct? That's correct. Okay. So depending on how high that goes and depending on its income, that may or may not result in a lot or a very few. And we don't have anything on the record. I'm with you. Nothing on the record. But in addition to that, I would simply point out that the way BAPC code works, is it pushes debtors from Chapter 7 to Chapter 13. Under Chapter 13, they take their disposable income and pay it to their secured and unsecured creditors. That doesn't change. The real stakeholders in this appeal, and I agree with Mr. Klee, are not Mrs. Penrod or debtors and automobile finance companies. The stakeholders, and this is true if you look back at the legislative history of and unsecured creditors, primarily credit card issuers. It's the credit card issuers that have the real interest in the outcome of this case. And so what happens is the debtor's disposable income is determined, and it's just a question of how it gets divvied up. If you read Professor Elizabeth Warren's article, which we cite in our brief, she makes that point very effectively. Price versus value, Mr. Klee claims that those are separate ones for sale, ones for loan. That's not what the text of Article 9 says. The text conflates them and says if you meet either the price or the value prong, it's a purchase money security interest. That was done deliberately in the Article 9 revisions. And in any event, the result you reach is the same, because it's the same definition in the comment. But I would simply point out that we can satisfy either prong and win this case. I believe Judge Goodwin asked, was this an appeal breaker? Let me interrupt for just a moment here. Over time, and I'm not going to cut you off, but I want you to be concise. I'll be very concise. Judge Goodwin asked, is this a deal breaker? Mr. Klee said he's not sure. Nothing in the record. There is testimony in the record to indicate that. In fact, I think it was asked by Judge Markell in the hearing in the BAP, and the answer was she probably could not have purchased the new car without trading in her used  And in any event, that was her choice. That was her decision. And when she made that decision, the negative equity on the trading vehicle had to be paid. Are these, Mr. Klee says, well, these are two separate transactions. You'd get a different result. The fact of the matter is these are not two separate transactions. It's a single transaction under one contract, one item of collateral, one debt, and a dealer and an automobile purchaser. It's not two separate transactions. New value. Mr. Klee discussed the new value requirement of the Bankruptcy Code and talked about this as being sort of a substitution of the old debt under the used car for the new debt under the new car. That's not what happened here. We have a substantially contemporaneous advance of new value by the dealer, which created a new debt. I think we understand what actually happened here. Okay. Last point I'll address is will this encourage people to file bankruptcy, to acquire a property with negative equity and file bankruptcy? It's going to do one of two things. I think it's undisputed. Number one, if the court affirms this decision, dealers are not going to be able to finance negative equity because they're not going to get automobile finance companies to buy the paper because they know if a bankruptcy is filed, they're going to get crammed down. They're going to get bifurcated on that negative equity. So deals are either not going to happen, or if they do happen, the exact outcome you predicted will occur. They're going to be told by their counsel, file a bankruptcy. We'll get rid of that negative equity. That's not an outcome this Court should encourage. Finally, Mr. Klee talked about the Dean v. Davis case, the famous U.S. Supreme Court case, and said, well, but under Dean v. Davis, they said it wasn't a preferential transfer. It wasn't a payment of antecedent debt, which the Court says. But he says they did hold it was a fraudulent transfer. There's nothing in the pleadings in this case. No claim was made in the bankruptcy court, the bankruptcy appellate panel, or in the briefs before this Court that this transaction was a fraudulent transfer, which it was not. Thank you, Your Honor. Thank you, both sides. Very, very nice arguments in a complicated case. Yes. The case of Penrod v. AmeriCredit Financial Services, now submitted for decision, will be in recess, and we will reconvene as reconstituted for the last case in a few minutes.
judges: Mills, Goodwin, Fletcher W.